FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
07/19/2022
JEFFREY P. COLWELL, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.

DELBERT SGAGGIO

And

Absolute Natural Rights


        Plaintiff,

v.

PHIL WEISER COLORADO ATTORNEY GENERAL

_____

MOTION FOR PRELIMINARY INJUNCTION

Pro Se I Delbert Sgaggio respectfully brings the following Motion for Preliminary injunction.

1

I respectfully asked the court rule that, Colorado Revised Statutes Title 18. Criminal Code § 18-12-302. Large-capacity magazines prohibited--penalties—exceptions: as unconstitutional. The grounds for this motion for preliminary injunction are set forth fully herein.

## **Introduction**

UVALDE SCHOOL SHOOTING

# "Systemic failures" in Uvalde shooting went far beyond local police, Texas House report details

In total, 376 law enforcement officers descended upon the school, according to the most extensive account of the shooting to date. It says that better-equipped departments should have stepped up to fill a leadership void after the Uvalde schools police chief failed to take charge.

BY **ZACH DESPART**    JULY 17, 2022    12 PM CENTRAL

| f | 🐦 | ✉ | COPY LINK | REPUBLISH |



1

When 376 cops stand around as children and teachers are being slaughter, we have a fucking

problem in America.  These Public Servants,  value there pension more then our children.

However a group of Public Servants Did Honor their Oaths, and in doing so they restored one, of

---

1 https://www.texastribune.org/2022/07/17/law-enforcement-failure-uvalde-shooting-investigation/

the most important Natural Rights, that is truly fundament to life, the right to Self Defense. NEW YORK STATE RIFLE & PISTOL ASSOCIATION,INC., ET AL. v. BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL. Simply put is a game changer.

This is the relief my family has been waiting for. My immediate family consists of four individuals. My wife and my two sons. All of my family with the exception of my youngest son has endured violent gang trauma. My wife was shot as a teenager in pueblo. My oldest son was shot in the Safeway parking lot in Pueblo shortly after his 18th birthday. Both incidences were gang related.  We know the truth, regardless of what the media tries to paint. It was not the gun's fault. Guns don't go around shooting people. Criminals do. The fundamental right to self-defense is a spiritual necessity to us. We cannot call the police for help. The only thing the police do to us is rob us, and violate our rights. My family refuses to have a victim's mentality. We are here, because we have the heart to fight.

**Factual Allegations**.

On or around 7/13/2022 I send Phil Wiser a "Demand for Rectify" (Exhibit R) the following is a brief excerpt from that Demand letter.

Colorado Revised Statue 18-12-302. Large-capacity magazines prohibited - penalties – exceptions. is unconstitutional and in direct conflict with NEW YORK STATE RIFLE &

PISTOL ASSOCIATION,INC., ET AL. v. BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL. Further more your unconstitutional law restricts me, from using the internet to purchase Standard capacity 30 round Magazines.

 It is now demanded that public servant Phil Weiser honor his oath and give directions to all Law enforcement, that Colorado Revised Statue 18-12-302. Large-capacity magazines prohibited - penalties – exceptions:  is unconstitutional and will no longer be enforced. Furthermore it is demanded that Phil Weiser takes the proper steps so that Internet gun companies, will be able to ship weapons to Colorado as the manufacturer intended them. That unconstitutional magazine limits, will no longer affect my ability to safely defend myself and my family.

The following three cases are the legal standard when it comes to the Second Amendment:

 NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. v. BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

District of Columbia v. Heller

McDonald v. Chicago

Furthermore Duncan v. Bonta is absolutely relevant do this injunction.

On Jun 30 2022, the Supreme Court sent Duncan v. Bonta back to the 9th circuit for the following reason:

Petition GRANTED. Judgment VACATED and case REMANDED for further consideration in light of New York State Rifle & Pistol Assn., Inc. v. Bruen, 597 U. S. ___ (2022).

I believe Judge Bumatay's Dissent in Duncan v. Bonta shows the exact reasons and law on why Colorado Revised Statutes Title 18. Criminal Code § 18-12-302.

is unconstitutional.

I lack legal training, I've never been to law school. However that makes no difference, I stand today to redress the government on my First Amendment. I call the Universe for help, my Ancestors, our Forefathers and the Framers will not let me down. They will not let, We The People down. I'm ready for the battle.

But that's what California does here. The state bans magazines that can carry over ten rounds—a firearm component with a long historical lineage commonly used by Americans for lawful purposes, like self-defense. Indeed, these magazines are lawfully owned by millions of people nationwide and come standard on the most popular firearms sold today.

*Duncan v. Bonta*, 19 F.4th 1087, 1139 (9th Cir. 2021)

" If California's law applied nationwide, it would require confiscating half of all existing firearms magazines in this country. " *Duncan v. Bonta*, 19 F.4th 1087, 1139 (9th Cir. 2021)

"While we acknowledge that California asserts a public safety interest, we cannot bend the law to acquiesce to a policy that contravenes the clear decision made by the American people when they ratified the Second Amendment." *Duncan v. Bonta*, 19 F.4th 1087, 1139 (9th Cir. 2021)

Indeed the Law makers of Colorado also, claim Colorado Revised Statutes Title 18. Criminal Code § 18-12-302. Is for public safety. However this is based on a political agenda. I have yet, to understand how giving criminals and the government a monopoly on weapons, makes We the People safer.   Regardless this public safety claim is not enough to violate my fundamental 2nd Amendment rights.

In *District of Columbia v. Heller* , 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that the Second Amendment confers "an individual right to keep and bear arms." This watershed case provided clear guidance to lower courts on the proper analytical framework for adjudicating the scope of the Second Amendment right. That approach requires an extensive analysis of the text, tradition, and history of the Second Amendment.

*Duncan v. Bonta*, 19 F.4th 1087, 1139 (9th Cir. 2021)

Under that approach, the outcome is clear. Firearms and magazines capable of firing more than ten rounds have existed since before the Founding of the nation. They enjoyed widespread use

throughout the nineteenth and twentieth centuries. They number in the millions in the country today. With no longstanding prohibitions against them, large-capacity magazines are thus entitled to the Second Amendment's protection. It's the People's decision in ratifying the Constitution, not California's, that dictates the result here.

*Duncan v. Bonta*, 19 F.4th 1087, 1139-41 (9th Cir. 2021)

Colorado lawmakers cannot override the People's decision in ratifying the Constitution.

The Second Amendment commands that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. At the outset, it's worth emphasis that the Second Amendment guarantees a pre-existing, fundamental, natural right. That's because it is necessary to "protect and maintain inviolate the three great and primary rights of personal security, personal liberty, and private property." 1 William Blackstone, Commentaries on the Laws of England, *136, *139. In other words, the right is among "that residuum of human rights, which is not intended to be given up to society, and which indeed is not necessary to be given for any good social purpose."[2]

*Duncan v. Bonta*, 19 F.4th 1087, 1141 (9th Cir. 2021)

The Second Amendment's fundamental nature follows from its close connection to the right of self-defense. As John Adams explained:

Resistance to sudden violence, for the preservation not only of my person, my limbs and life, but of my property, is an indisputable right of nature which I have never surrendered to the public by the compact of society, and which perhaps, I could not surrender if I would.

*Duncan v. Bonta*, 19 F.4th 1087, 1141 (9th Cir. 2021)

The fundamental nature of the Second Amendment has been well recognized by the Supreme Court. At its core, the Court held, the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller* , 554 U.S. at 635, 128 S.Ct. 2783. The protection is an individual one and extends to all bearable arms that are typically possessed by law-abiding citizens for lawful purposes, like self-defense. *Id.* at 582, 595, 625, 128 S.Ct. 2783. Moreover, the right is so "fundamental" and "deeply rooted in this Nation's history and tradition," that it is "fully applicable to the States." *McDonald v. City of Chicago* , 561 U.S. 742, 750, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (simplified)

*Duncan v. Bonta*, 19 F.4th 1087, 1142 (9th Cir. 2021)

That the Court has uniformly rejected "interest balancing" when it comes to the Second Amendment is nothing new. Then-Judge Kavanaugh understood as much shortly after *Heller* and *McDonald* were decided. As he explained, the Supreme Court "set forth fairly precise guidance to govern" Second Amendment challenges. *Heller II* , 670 F.3d at 1271 (Kavanaugh, J., dissenting). " *Heller* and *McDonald* ," he said, "leave little doubt that courts are to assess gun

bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Id.* More recently, Justice Kavanaugh has articulated his "concern that some federal and state courts may not be properly applying *Heller* and *McDonald.* " *N.Y. State Rifle & Pistol Ass'n v. City of New York* , ——— U.S. ———, 140 S. Ct. 1525, 1527, 206 L.Ed.2d 798 (2020) (Kavanaugh, J., concurring).

*Duncan v. Bonta*, 19 F.4th 1087, 1146 (9th Cir. 2021)

Contrary to the majority's reiteration of a tiers-of-scrutiny, sliding scale approach, *Heller* commands that we interpret the scope of the Second Amendment right in light of its text, history, and tradition. That's because constitutional rights "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller* , 554 U.S. at 634–35, 128 S.Ct. 2783.

*Duncan v. Bonta*, 19 F.4th 1087, 1148 (9th Cir. 2021)

*Heller* announced a straightforward analytical framework that we are not free to ignore: the Second Amendment encompasses the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635, 128 S.Ct. 2783. As a "prima facie" matter, that right extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582, 128 S.Ct. 2783. Any regulation that infringes on the exercise of this right implicates conduct protected by the Second Amendment.

*Duncan v. Bonta*, 19 F.4th 1087, 1148 (9th Cir. 2021)

But because the Second Amendment right is "not unlimited," *id.* at 595, 128 S.Ct. 2783,

regulations that are "historical[ly] justifi[ed]" do not violate the right, *id.* at 635, 128 S.Ct. 2783.

Primarily, the "Second Amendment does not protect those weapons not typically possessed by

law-abiding citizens for lawful purposes," such as M-16s and short-barreled shotguns. *Id.* at 625,

128 S.Ct. 2783. In making this inquiry, we look to the "historical tradition," which has excluded

"dangerous and unusual" weapons from the Amendment's protection. *Id.* at 627, 128 S.Ct. 2783.

In the same way, the Amendment *does* protect weapons in "common us[age]." *Id.* Finally, the

Second Amendment does not disturb "longstanding prohibitions" on the sale, possession, or use

of guns with sufficient historical antecedents. *Id.* at 626–27, 128 S.Ct. 2783.

*Duncan v. Bonta*, 19 F.4th 1087, 1148-49 (9th Cir. 2021)

" **Under *Heller, Large-Capacity Magazine Bans Are Unconstitutional*** With a firm

understanding of the approach directed by *Heller* , we turn to California's large-capacity ban."

*Duncan v. Bonta*, 19 F.4th 1087, 1151 (9th Cir. 2021)

Indeed Heller also applies to Colorado Revised Statutes Title 18. Criminal Code § 18-12-302.

And the 10th circuit.

Large-capacity magazines are "arms" under the Second Amendment.

To begin, when assessing a ban on a category of weapons, we look to whether the regulation infringes on the use of instruments that constitute "bearable arms" under the Second Amendment. *Heller* , 554 U.S. at 582, 128 S.Ct. 2783. The Court tells us that the term "bearable arms" includes any "[w]eapons of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] ... for the purpose of offensive or defensive action." *Id.* at 581, 584, 128 S.Ct. 2783 (simplified). It doesn't matter if the "arm" was "not in existence at the time of the founding." *See id.* at 582, 128 S.Ct. 2783.

At issue here are magazines capable of carrying more than ten rounds. A "magazine" is a firearm compartment that stores ammunition and feeds it into the firearm's chamber. The magazines are integral to the operation of firearms. As a result, many popular firearms would be practically inoperable without magazines.

*Duncan v. Bonta*, 19 F.4th 1087, 1151 (9th Cir. 2021)

That the law bans magazines rather than the guns themselves does not alter the Second Amendment inquiry. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis* , 136 S. Ct. at 1097 (Thomas, J., concurring). "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized[.]" The Federalist No. 44, at 282 (James Madison) (Charles R. Kesler ed., 2003). Without protection of the components that render a firearm operable, the Second Amendment would be meaningless. *See Luis* , 136 S. Ct. at 1098 (Thomas, J., concurring); *see also Fyock v.*

*Sunnyvale* , 779 F.3d 991, 998 (9th Cir. 2015) (recognizing the "right to possess the magazines necessary to render ... firearms operable").

*Duncan v. Bonta*, 19 F.4th 1087, 1151 (9th Cir. 2021)

**Large-capacity magazines are typically possessed by law-abiding citizens for lawful purposes.** " *Duncan v. Bonta*, 19 F.4th 1087, 1151-52 (9th Cir. 2021)

California asserts that the Second Amendment doesn't extend to weapons "most useful in military service." *Heller* did not establish such an exception. In fact, *Heller* said the opposite: the Amendment's prefatory clause reference to the "conception of the militia" means that the right protects "the sorts of lawful weapons that [citizens] possessed at home [to bring] to militia duty." 554 U.S. at 627, 128 S.Ct. 2783. Justice Alito squarely dispensed with California's argument in *Caetano* , stating that the Court has "recognized that militia members traditionally reported for duty carrying the sorts of lawful weapons that they possessed at home, and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." 577 U.S. at 419, 136 S.Ct. 1027 (Alito, J., concurring) (simplified).

*Duncan v. Bonta*, 19 F.4th 1087, 1152 n.22 (9th Cir. 2021)

The next step in the Court's analysis requires that we determine whether large-capacity magazines are "typically possessed by law-abiding citizens for lawful purposes." *Heller* , 554 U.S. at 625, 128 S.Ct. 2783. As we stated, this inquiry examines the historical record to

determine whether the weapons are "dangerous and unusual," on the one hand, or whether they

are in "common use," on the other. *Id.* at 627, 128 S.Ct. 2783 (simplified).

*Duncan v. Bonta*, 19 F.4th 1087, 1152 (9th Cir. 2021)

First, a word about "common usage." We start with the well-established premise that the

Constitution protects enduring principles: "The meaning of the Constitution is fixed when it is

adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

*W. Coast Hotel Co. v. Parrish* , 300 U.S. 379, 404, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Thus,

absent amendment, "the relevant [constitutional] principles must be faithfully applied not only to

circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern

situations that were unknown to the Constitution's Framers." *Heller II* , 670 F.3d at 1275

(Kavanaugh, J., dissenting).

*Duncan v. Bonta*, 19 F.4th 1087, 1152 (9th Cir. 2021)

Here, we look to the Second Amendment's text for its enduring meaning. Its prefatory clause

reads: "A well regulated Militia, being necessary to the security of a free State[.]" U.S. Const.

amend. II. The Court has told us that this prefatory clause "fits perfectly" with the Amendment's

operative clause's individual right to keep and bear arms: "the way tyrants had eliminated a

militia consisting of all the able-bodied men was not by banning the militia but simply by taking

away the people's arms, enabling a select militia or standing army to suppress political

opponents." *Heller* , 554 U.S. at 598, 128 S.Ct. 2783. Thus, the prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599, 128 S.Ct. 2783.

*Duncan v. Bonta*, 19 F.4th 1087, 1152 (9th Cir. 2021)

Understanding this background informs the type of weapons protected by the Second Amendment. As the Court wrote:

In all the colonies, as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence. The possession of arms also implied the possession of ammunition, and the authorities paid quite as

much attention to the latter as to the former.

*Miller* , 307 U.S. at 179–80, 59 S.Ct. 816 (simplified). The militia system then created a central duty: "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179, 59 S.Ct. 816. Thus, the lifeblood of militia service was citizens armed with weapons typically possessed at home for lawful purposes. As a result, the Second Amendment protects such weapons *as a class. See Heller* , 554 U.S. at 627, 128 S.Ct. 2783.

*Duncan v. Bonta*, 19 F.4th 1087, 1152-53 (9th Cir. 2021)

So, the Second Amendment protects the type of bearable weapons commonly used by citizens and at the ready for militia service—whether it be in 1791 or today. What remains is an inquiry that is simultaneously historical and contemporary. The historical inquiry is relevant because we "reason by analogy from history and tradition" when interpreting the Constitution. *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.* , 974 F.3d 237, 257 (3d Cir. 2020) (Matey, J., dissenting) (simplified). The Second Amendment right thus extends to "modern-day equivalents" of arms protected at the Founding. *See Parker v. District of Columbia* , 478 F.3d 370, 398 (D.C. Cir. 2007) ("[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol."), *aff'd sub nom., Heller* , 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637. For this reason, even new or relatively unpopular firearms today might enjoy the Second Amendment's protection if they are "modern-day equivalents" of firearms that have been commonly owned for lawful purposes. Of course, the protection extends equally to weapons not in common use as a historical matter, so long as they are "commonly possessed by law-abiding citizens for lawful purposes *today.* " *Caetano* , 577 U.S. at 420, 136 S.Ct. 1027 (Alito, J., concurring).

*Duncan v. Bonta*, 19 F.4th 1087, 1153 (9th Cir. 2021)

It is no matter that citizens don't typically serve in militias today, or that the weapons protected by the Second Amendment would be comparatively ineffective in modern warfare. As *Heller* explained, "the fact that modern developments have limited the degree of fit between the

prefatory clause and the protected right cannot change our interpretation of the right." *Heller* ,

554 U.S. at 627–28, 128 S.Ct. 2783.

*Duncan v. Bonta*, 19 F.4th 1087, 1153 n.24 (9th Cir. 2021)

Large-capacity magazines enjoy a long historical pedigree.

Looking at the historical record, large-capacity magazines are clear modern-day equivalents of arms in common use by the incorporation of the Second Amendment and are, thus, entitled to constitutional protection. As Judge Lee concluded: "Firearms or magazines holding more than ten rounds have been in existence—and owned by American citizens—for centuries. Firearms with greater than ten round capacities existed even before our nation's founding, and the common use of [large-capacity magazines] for self-defense is apparent in our shared national history." *Duncan* , 970 F.3d at 1147 ; *see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions* , 78 Alb. L. Rev. 849, 851 (2015) ("[I]n terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

Rather than re-tell the long history of large-capacity magazines in this country, we offer some highlights:

• The first known firearm capable of firing more than ten rounds without reloading was a 16-shooter invented in 1580.

• The earliest record of a repeating firearm in America noted that it fired more than ten rounds: In 1722, Samuel Niles wrote of Indians being entertained by a firearm that "though loaded but once, ... was discharged eleven times following, with bullets, in the space of two minutes." Harold L. Peterson, Arms and Armor in Colonial America 1526–1783, 215 (2000).

• At the Founding, the state-of the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity.

• In 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress, seeking approval for its manufacture. Robert Held, The Belton Systems, 1758 & 1784–86: America's First Repeating Firearms 37 (1986).

• By the 1830s, "Pepperbox" pistols had been introduced to the American public and became commercially successful. Depending on the model, the Pepperbox could fire 5, 6, 12, 18, or 24 rounds without reloading.

• It took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace.

• From the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines.

• By 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute. A later iteration of this rifle, the 16-round

Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866.

• By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds. All told, Winchester made over 170,000 copies of the from 1866 to 1898. *See* Norm Flayderman, Flayderman's Guide to Antique Firearms and Their Values 268 (6th ed. 1994).

• A few years later, Winchester produced the M1873, capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919.

From this history, the clear picture emerges that firearms with large-capacity capabilities were widely possessed by law-abiding citizens by the time of the Second Amendment's incorporation. In that way, today's large-capacity magazines are "modern-day equivalents" of these historical arms, and are entitled to the Second Amendment's protection.

*Duncan v. Bonta*, 19 F.4th 1087, 1154-55 (9th Cir. 2021)

*Magazines with over ten rounds are widely used for lawful purposes today.*

It is also uncontested that ammunition magazines that hold more than ten rounds enjoy widespread popularity today. This is evident from the fact that as many as 100,000,000 such magazines are currently lawfully owned by citizens of this country. It's also apparent from the fact that those magazines are a standard component on many of the nation's most popular firearms, such as the Glock pistol, which comes with a magazine that holds 15 to 17 rounds. They are lawful in at least 41 states and under Federal law. Indeed**,** large-capacity magazines account for *half* of all magazines owned in the United States today. Thus, the record in this case shows that large-capacity magazines are in common use for lawful purposes today, entitling them to Second Amendment protection.

*Duncan v. Bonta*, 19 F.4th 1087, 1155 (9th Cir. 2021)

We can go on and on with examples. Since 1964, Ruger has sold six million copies of its 10/22 rifles, which is manufactured with 10-round, 15-round, and 25-round magazines. More than five million AR-15 rifles have been sold, typically with 30-round magazines. The commonality of large-capacity magazines is well accepted by other courts. *See, e.g., Heller II* , 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend" because "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000.").

*Duncan v. Bonta*, 19 F.4th 1087, 1155 n.25 (9th Cir. 2021)

Not only are they ubiquitous, the large-capacity magazines are used for lawful purposes, like home defense. Millions of semiautomatic pistols, the "quintessential self-defense weapon" for the American people, *Heller* , 554 U.S. at 629, 128 S.Ct. 2783, come standard with magazines carrying over ten rounds. Many citizens rely on a single, large-capacity magazine to respond to an unexpected attack. As one firearms expert put it: firearms equipped with a magazine capable of holding more than ten rounds are "more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so." This is why many Americans choose to advantage themselves by possessing a firearm equipped with a large-capacity magazine and why the ownership of those magazines is protected by the Second Amendment.

*Duncan v. Bonta*, 19 F.4th 1087, 1155 (9th Cir. 2021)

California does not refute any of this. Indeed, courts throughout the country agree that large-capacity magazines are commonly used for lawful purposes. *See Ass'n of N.J. Rifle & Pistol Clubs* , 910 F.3d at 116–17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense[.]" (simplified)); *N.Y. State Rifle & Pistol Ass'n* , 804 F.3d at 255 ("[S]tatistics suggest that about 25 million large-capacity magazines were available in 1995, ... and nearly 50 million such magazines—or nearly two large-capacity magazines for each gun capable of accepting one—were approved for import by

2000.). Even our court has begrudgingly admitted as much. *See Fyock* , 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use. And, to the extent that certain firearms capable of use with a magazine—e.g., certain semiautomatic handguns—are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

*Duncan v. Bonta*, 19 F.4th 1087, 1155-56 (9th Cir. 2021)

In sum, firearms with magazines capable of firing more than ten rounds are commonplace in America today. And they are widely possessed for the purpose of self-defense, the very core of the Second Amendment. Accordingly, an overwhelming majority of citizens who own and use large-capacity magazines do so for lawful purposes. "Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Friedman* , 136 S. Ct. at 449 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (emphasis added). So, unless subject to "longstanding prohibition," they are protected by the Second Amendment.

*Duncan v. Bonta*, 19 F.4th 1087, 1156 (9th Cir. 2021)

ans on large-capacity magazines are not a presumptively lawful regulatory measure.

After completing its analysis, *Heller* cautioned: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller* , 554 U.S. at 626–27, 128 S.Ct. 2783. The Court also noted that its list of "presumptively lawful regulatory measures" was not "exhaustive." *See id.* at 627 n.26 128 S.Ct. 2783. Thus, it would be wise to ask whether California's law enjoys the endorsement of history. Our task, therefore, is to determine "whether the challenged law traces its lineage to founding-era or Reconstruction-era regulations," *Duncan* , 970 F.3d at 1150, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller* , 554 U.S. at 634–35, 128 S.Ct. 2783. As a preview, California cannot meet this showing: the magazine ban's earliest analogues only show up in the early twentieth century, which doesn't meet the definition of "longstanding" under *Heller.*

*Duncan v. Bonta*, 19 F.4th 1087, 1156-57 (9th Cir. 2021)

The Court's first example of a longstanding and presumptively lawful regulatory measure is the "prohibition[ ] o[f] the possession of firearms by felons and the mentally ill." *Heller* , 554 U.S. at 626, 128 S.Ct. 2783. Prohibiting the possession of arms by those found by the state to be dangerous, like violent criminals, dates to the Founding. And prohibiting the mentally ill from

exercising firearms rights also has roots dating to the Founding. *See Mai* , [974 F.3d at 1090](#)

(Bumatay, J., dissenting from the denial of reh'g en banc).

*Duncan v. Bonta*, 19 F.4th 1087, 1157 (9th Cir. 2021)

"California's experiment bans magazines that are commonly owned by millions of law-abiding citizens for lawful purposes. These magazines are neither dangerous and unusual, nor are they subject to longstanding regulatory measures. In ratifying the Second Amendment, the People determined that such restrictions are beyond the purview of government. " *Duncan v. Bonta*, 19 F.4th 1087, 1159 (9th Cir. 2021)

I would like to thank the universe for Judge Bumatay's dissent. I could have never argued this injunction to this level with out his help. Once again some one else has did the heavy lifting for me. I am very grateful for Judge Bumatays Public service, I am very proud to be able to use his argument in the Defense of the Constitutional Republic.

 A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. See *Munaf* v.

*Geren*, 553 U. S. __, __ (2008) (slip op., at 12); *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987); *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311–312 (1982).

I will succeed on my merits, NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. v. BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL is the law of the land. My Rights are being violated.

 A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf*, 553 U. S., at __ (slip op., at 12). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U. S., at 542. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero-Barcelo*, 456 U. S., at 312; see also *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 500 (1941)

The public has a right to Self Defense. Giving We The People the same access to, weapons that criminals are currently using is a win for the public. As for the Government, if you are trying to disarm the people there's probably a dark racist agenda involved in that.

**Conclusion**

Simply put our country was built on guns and violence. Our forefathers and the framers have made, unimaginable sacrifices for freedom and liberty. It is truly disgusting the Colorado believes a political agenda is worth more, then our Forefather's sacrifices. I ask respectfully that the court restores my natural right to self-defense and honors the second amendment. Label Colorado Revised Statutes Title 18. Criminal Code § 18-12-302 unconstitutional, and stop all enforcement of this racist gun control.

Dated 7/19/2022

Delbert Sgaggio

5219 Constitution Ave

Colorado Springs, Colorado 80915

Overclock420@hotmail.com

719 351 0801
